UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

## Ronald C. Thomas, Jr.

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ **MAR 12 2013** ★

LONG ISLAND OFFICE
**COMPLAINT**

NAME OF PLAINTIFF(S)

v.

12-6363 (JFB)(ARL)
Ammended

## The Burmax Company Inc.

NAME OF DEFENDANT(S)

This action is brought for discrimination in employment pursuant to (check only those that apply):

☐ Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) (race, color, gender, religion, national origin).
**NOTE:** *In order to bring a suit in federal district court under Title VII, you must first obtain a right to sue letter from the Equal Employment Opportunity Commission.*

☐ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 - 634 (amended in 1984, 1990, and by the Age Discrimination in Employment Amendments of 1986, Pub. L. No. 92-592 , the Civil Rights Act of 1991, Pub. L. No. 102-166).
**NOTE:** *In order to bring a suit in federal district court under the Age Discrimination in Employment Act, you must first file charges with the Equal Employment Opportunity Commission.*

☑ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 - 12117 (amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325 and the Civil Rights Act of 1991, Pub. L. No. 102-166).
**NOTE:** *In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a right to sue letter from the Equal Employment Opportunity Commission.*

-1-

Jurisdiction is specifically conferred upon this United States District Court by the aforementioned statutes, as well as 28 U.S.C. §§ 1331, 1343. Jurisdiction may also be appropriate under 42 U.S.C. §§ 1981, 1983 and 1985(3), as amended by the Civil Rights Act of 1991, Pub. L. No. 102-166, and any related claims under New York law.

1.   Plaintiff resides at:

## P.O. BOX 1323
Street Address

| SUFFOLK | NY | 11978 | 631-766-6338 |
|---|---|---|---|
| County | State | Zip Code | Telephone Number |

2.   Defendant(s) resides at, or its business is located at:

## 28 BARRETTS AVE
Street Address

| SUFFOLK | HOLTSVILLE | NY | 11742 |
|---|---|---|---|
| County | City | State | Zip Code |

3.   The address at which I sought employment or was employed by the defendant(s) is:

## 28 BARRETTS AVE
Street Address

| SUFFOLK | HOLTSVILLE | NY | 11742 |
|---|---|---|---|
| County | City | State | Zip Code |

4.     The discriminatory conduct of which I complain in this action includes
       *(check only those that apply).*

☐     Failure to hire.

☑     Termination of my employment.

☐     Failure to promote.

☑     Failure to accommodate my disability.

☐     Unequal terms and conditions of my employment.

☑     Retaliation

☐     Other acts *(specify)*: _____.

**NOTE**:     *Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court.*

5.     It is my best recollection that the alleged discriminatory acts occurred on:
       January-May 2008, June 24, 2008, August 22, 2008
       _____
       Date(s)

6.     I believe that the defendant(s) *(check one)*

       ☑     is still committing these acts against me.

       ☐     is <u>not</u> still committing these acts against me.

7.     Defendant(s) discriminated against me based on my:
       *(check only those that apply and state the basis for discrimination, for example,*
       *what is your religion, if religious discrimination is alleged)*

       ☐     race _____     [ ]   color _____

       ☐     gender/sex _____     [ ]   religion _____

       ☐     national origin _____

       ☑     disability  refusal to provide accommodation & retaliation
             _____

       ☐     age.  If age is checked, answer the following:

             I was born in _____.  At the time(s) defendant(s) discriminated against me,
                           Year

             I was ☐ more  ☐ less than 40 years old.  *(check one)*.

-3-

**NOTE:**    *Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court.*

8.    The facts of my case are as follows:

refer to attached complaint

_____

_____

_____

_____

_____

_____

_____

*(Attach additional sheets as necessary)*

**NOTE:**    *As additional support for your claim, you may attach to this complaint a copy of the charge filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights, or the New York City Commission on Human Rights.*

9.    It is my best recollection that I filed a charge with the New York State Division of Human Rights or the New York City Commission on Human Rights regarding defendant's alleged discriminatory conduct on: June 16, 2009 .
Date

10.    It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct on: June 16, 2009 .
Date

-4-

**Only litigants alleging age discrimination must answer Question #11.**

11.    Since filing my charge of age discrimination with the Equal Employment Opportunity

Commission regarding defendant's alleged discriminatory conduct *(check one)*:

☐    60 days or more have elapsed.

☐    less than 60 days have elapsed.

12.    The Equal Employment Opportunity Commission *(check one)*:

☐    has not issued a Right to Sue letter.

☑    has issued a Right to Sue letter, which I
received on 09/29/2012 (at my PO Box Address) .
                    Date

**NOTE:**    Attach a copy of the Right to Sue Letter from the Equal Employment Opportunity
Commission to this complaint.

WHEREFORE, plaintiff prays that the Court grant such relief as may be appropriate,
including injunctive orders, damages, costs, and attorney's fees.

*Ronald Thomason Jr*

PLAINTIFF'S SIGNATURE

Dated: 12/26/12

PO BOX 1323

Address
WESTHAMPTON BEACH, NY 11978

631-766-6338

Phone Number

rev. 5/1/12

ComplaintUnderTitleVII,ADAorADEAEDNY.rev.5/1/12
-5-

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

RONALD THOMAS, JR.,

                          Plaintiff,              **COMPLAINT**

                                                  **PLAINTIFF DEMANDS**
                                                  **TRIAL BY JURY**

         **v.**

THE BC COMPANY, INC.,

                          Defendant.

_____

Plaintiff, Ronald Thomas, Jr., as *pro se* allege for his Complaint as follows:

### THE PARTIES

1.  I, Ronald Thomas, Jr., currently receive mail at P.O. Box 1323, Westhampton Beach, N.Y.
    11978.

2.  I am a legal resident of the State of New York.

3.  I was employed by the Defendant The Burmax Company, Inc., ("BC") from mid July
    2006 through August 22, 2008.

4.  BC's principal place of business is 28 Barretts Avenue, Holtsville, N.Y.  11742.

5.  I worked for the defendant at the above address.

**NATURE OF THE ACTION**

6. This is a civil action for damages and remedies brought under the Americans with Disabilities Act of 1990 42 U.S.C. §§ 12122 et seq. ("ADA") for damages for discrimination against Plaintiff, a qualified individual with a disability and the New York State Executive Law § 296 et seq. ("New York State Human Rights Law").

**JURISDICTION AND VENUE**

7. Jurisdiction is founded upon 28 U.S.C. § 1331 and principles of supplemental jurisdiction under 28 U.S.C. § 1367.

8. I filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 16, 2009.

9. I received a Notice of Right to Sue on September 25, 2012. (A Copy of the Letter is attached as Exhibit A.)

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b) and (c) because BC does business at a location located within the Eastern District of New York and a substantial part of the events giving rise to my claim occurred within the Eastern District of New York.

**FACTS**

11. In July 2006 I began my employment at BC as the Information Technology ("IT") Manager.

12. Prior to working at BC I had twenty-seven years of professional experience in IT.

13. From 1980 – 1982 I worked at Equibank as a Data Center Shift Supervisor.

14. From 1982 – 2002 I worked at GlaxoSmithKline in various management roles working with C-Level and global staff related to IT initiatives.

2

15. From 2002 – 2006 I worked at WMF AG, a German based company working as an IT Director interacting with global staff.

16. At all times at BC I performed my job satisfactorily.

17. My one and only employment evaluation stated that I am a very hard worker and that I am always willing to put in as much time necessary to get the job done.

18. My one and only employment evaluation also states that I was never tardy or absent.

19. During acceptance of my job at BC it was verbally agreed upon by Tom Forte ("the Controller") and Steven Scheff ("the President") that my hours over 40-hours per week would be compensated in "comp time."

20. Comp time is days off rather than being compensated monetarily for which I rarely received.

21. Over a two year period I had swiped in/out of the ADP time clock system tallying up estimated 720-hours of unpaid overtime which I considered "dedication to my job".

22. I possessed an entrepreneurial approach to "do whatever it takes to get the job done" and my excessive work hours substantiate my work ethic.

23. The Controller told me that he and the President had selected me for the job and explained that my predecessor was uncooperative and that BC did not feel that he could handle the job.

24. During the interview I specifically asked about interruptions and the President told me that the interruptions are under 15% and that they are silly matters.

25. My responsibilities included the support of the headquarters' staff, the help desk, computer security, data backup efforts, month-end processes for closing, creating specialized database reports for the President and management, and dealing with vendors

in order to obtain estimates on new equipment, systems, and services, and project management.

26. My first year with BC was very busy but I was determined to show my value to the company.

27. My primary responsibility unlike my predecessor and successor was to implement several new hardware and software systems in support of the company's sales significantly increasing.

28. The existing systems were frequently crashing due to the increased business being entered into the Order Entry System. These systems were inadequate in respect to its memory and storage capacity and could not efficiently handle the influx of business. There was a sense of urgency to upgrade these systems as soon as possible.

29. Within a week of starting my job at BC, I determined that the Controller had overlooked a major prerequisite in upgrading the company's server systems. With my expertise I had discovered that two of the server systems could not be upgraded until the obsolete 50+ Windows 98se desktops were replaced first.

30. The Controller didn't want to reveal his budgeting error to the President and he didn't want to spend approximately $40,000 on 50 new desktop PC's.

31. In order to not uncover a gross budgeting error made by the Controller to the President, I spearheaded and converted the entire obsolete desktop PC environment with the help of an inexperienced part-time helper.

32. In the year 2006 it was unheard-of to have a business with over 50 PC's running Windows 98se software when Windows XP was introduced and rolled at many other companies as early as 2002.

4

33. Even though these desktop PC's were eventually converted to Windows XP, they were still inadequate and problematic for the end-user and for me to support on a daily basis because the hardware (e.g., memory, hard drive) frequently failed.

34. In order to complete that task upgrading these desktop PC's I worked late nights through the holiday season and into the year of 2007.

35. These Windows XP software upgrades were impractical because most of these PC's were approximately 6-years old with failing components (e.g., memory, hard drive).

36. Once the manual upgrades of the Microsoft software were completed, licenses costing approximately $18,000 needed to be paid for.  This $18,000 was the alternative to purchasing new PC's at approximately $40,000.  The Controller resisted payment of the $18,000.

37. Such action is considered fraud and if caught "pirating software" through an audit, the company (and the IT Manager) would have faced legal consequences.  I had presented the Controller with several quotations and opportunities to become compliant with the company's use of these software.

38. The company's sales had increased significantly and there was no reason whatsoever for the Controller to not pay for these upgrades.

39. Two years after my start date and upgrading these software products, the Controller still had not paid (approximately $18,000) to legally use these Microsoft software.

40. These manual upgrading of these obsolete PC's became problematic in that they hindered my productivity.

41. It was during this time that I realized that I had insufficient help to satisfy the needs of BC and that I was caught up in a self-serving mission of the Controller to secure his own bonus package by seeing that the owners received the most return for their investment.

42. The Controller actually told me, "It is my job to see that the Owners receive the most return for their investment".

43. By 2007 the sales at BC had increased significantly and the workload became nearly unmanageable; however, I did whatever it took to perform the job.

44. I worked over 720-hours of unpaid overtime at BC over the period for which I was employed.

45. During my interview with BC, the President claimed that the interruptions were under 15% of the job but I learned that percentage had grown to 80% due to the obsolete desktop PC's continuing to malfunction, the server hosting the order entry system crashing quite frequently due to the inadequate processing speed and capacity required for the abundance of orders being entered due to the significant increase in sales.

46. My only help was a college student who worked part-time and earned ten (to thirteen) dollars ($10-13.00) an hour and he had very little initiative and minimal technical experience.

47. I had been working late hours consistently and began feeling as though I was doing the work of three professionals with my experience level.

48. I began to realize that the IT Support Staff to Employee ratio at BC was incorrect and even more so due to: 1.) having the inexperienced part-time helper, 2.) my primary responsibility was to manage the implementation of 4 new servers, 3.) the company's sales had significantly increased.

49. At my previous job at WMF-USA the ratio for IT Support Staff to Employees was 1:35.

50. The employees (computer end users) refused to seek help from my assistant; therefore, I had to handle the matters which were so frequent that it was necessary that I worked late hours to perform the primary responsibility to upgrade the servers to accommodate the significant increase in sales.

51. Most of these employees came straight to me for immediate results not understanding that my assistant was there as the first line of defense so that I could work on more high-level matters and my special projects as assigned by the Controller and the President.

52. According to the President at a Workers' Compensation deposition on October 6, 2009, he confirmed that his company employed 140 employees.

53. According to the Controller at a Workers' Compensation deposition on October 6, 2009, he stated "Everybody sought to go to him first."

54. Ratio at BC   1:140

55. According to an industry study of the number of IT Support Staff per Employee based on 103 organizations, the ratio was 1:11 (25th percentile), 1:27 (50th percentile), and 1:52 (75th percentile).

56. This study was published on the following Human Resources portal: http://www.workforce.com/article/20030206/NEWS02/302069998#

57. Regardless of these statistics, the situation at BC was reality; therefore, I and applied an "whatever it takes" entrepreneurial outlook and worked 720-hours of unpaid overtime.

58. Although I had been asking for assistance all along, it was in the early spring 2008 that I had asked the Controller for an official accommodation (both verbal and written) to ease my severe "work related" anxiety disorder.

59. An accommodation as such was necessary due to the additional work load as a result of the significant increase in sales and the fact that the employees chose to always come to me first rather than my assistant.

60. It was also during this time that I told the Controller about my stress and the psychiatric visits that were work related stressors that went back a year earlier.

61. The accommodation I requested was for another staff member to help with the high volume of calls and visits I received at my desk.

62. The help could have been temporary so that I could focus my primary responsibility to upgrade the servers replacing the existing ones that were crashing sometime twice per day. The systems would crash because they couldn't handle the amount of orders entered due to the significant increase in sales.

63. It was not unreasonable that I asked for an accommodation under these circumstances.

64. I was treated differently from other Managers in respect to hiring adequate staff to support the business growth.

65. The difference was that I reported to the Controller who denied my repeated requests for help (and my accommodation) because he was offsetting what the President was spending in hiring additional staff to areas other than the IT Department.

66. As the sales had increased significantly the President had authorized additional staff for those other departments because those departments brought in more-and-more sales.

67. Because I reported to the Controller, I received no adequate help which caused me to work harder-and-harder to maintain a high level of service.

68. The harder I worked and the more hours I worked, the company demanded even more efforts from me.

8

69. The Controller provided very little assistance to help me and would frequently leave the office by 5:30pm.

70. BC was actually operating daily in a crisis mode because the server applications (e.g., Order Entry, Warehouse Management) were crashing sometimes twice per day. I not only had to focus on getting the system up and running, but also handle the influx of employees coming to me (at that same moment) informing me of an outage I already was aware of.

71. BC was at least a year away from the implementation of these new systems

72. I needed the accommodation because without an intermediary to deal with the frequent interruptions and small problems all issues fell on my lap on an ongoing basis.

73. So along with troubleshooting the systems and managing my projects I had to assist with employee questions seemingly every minute that significantly reduced my opportunity of time required to strategize and plan the new system implementations I was hired to work on as my priority.

74. My predecessor and successor both did not have the same work load as I; therefore, my accommodation was justifiable.

75. The Controller's bonus was based on seeing that the Owners received the most return on their investment; therefore, he wouldn't provide me an accommodation. He didn't want to pay for it just as he didn't want to purchase new PC's at $40,000. Just as he didn't pay for the Microsoft software upgrades at $18,000 and committed fraud.

76. This is what led to my stress reaching a boiling point.

77. All that I could do is work hard-and-harder to maintain the work load. Unlike my predecessors and successor, and other employees, I provided the company with

9

approximately 720-hours of unpaid overtime dedication.  I rarely was able to enjoy a lunch, and usually had no dinner whatsoever.

78. In an attempt to circumvent the problem I asked to set up a special help desk e-mail account for the employees to submit their IT requests.

79. The Controller and the President objected indicating that most of the employees would need their problems/requests tended to immediately and that they ultimately would not use the special e-mail account.

80. Without a more experienced assistant which would have required an hourly wage of more than $10-13/hour, at the directive of my employer I was required to both assist whoever was in my office and answer any incoming phone calls simultaneously.

81. On a typical day I had 2-3 employees at my door every 5-minutes along with incoming phone calls.

82. I attempted to close my door so that I could concentrate on my special projects thinking that this would force the employees to seek help from my assistant but the employees would open my door without knocking and insist on interrupting me.

83. Due to work-related stress I needed these interruptions minimized because I was hired to implement several new systems and the barrage of questions made the situation untenable.

84. My stress level was at all time high and I was struggling with day to day activities at work and personally.

85. The Controller would frequently ask me why my face was red during these frequent times of stress when the employees would interrupt me.

86. During these frequent interruptions I experienced heart palpitations, redness in my face, difficulty breathing.

87. I was having chronic trouble dealing with my bowel movements.

88. Meal preparation and the ability to eat actual healthy meals suffered.

89. I couldn't go into the bathroom, leave for lunch, or go home at a reasonable time without someone looking for me.

90. I'm not a quitter and my work ethic was outstanding, so my only choice was continue working the long hours and seek help from a Psychiatrist to deal with my work related stressors.

91. I dealt with this situation in the utmost professional manner possible. I had been discussing this situation with my doctor and the Controller.

92. Not only did the Controller know about my sessions with a Psychiatrist who counseled and treated me for work-related stress but I found him reading one of my prescription pill bottles.

93. With over 25-years of expertise in the Information Technology field, I performed an outstanding job at BC.

94. The interruptions that the President said were fewer than 15% (at the time of my interview) was an untrue statement and became the reason I needed an accommodation.

95. I had been told that both of my predecessors were unable to handle this job.

96. Jaime Sanchez, my predecessor was terminated because he would not make himself available after 5:00pm.

97. Al Raff, Jaime Sanchez' predecessor was terminated because he couldn't handle the job and I was told that he had filed an EEOC Age Discrimination complaint against BC.

98. Both of my predecessors had not the same responsibilities as me, nor had they experienced the significant growth in sales during the period which I was employed.

11

99. My predecessor worked normal hours and always left the office at 5:00pm.

100. I was performing the job of three professionals at my experience level and over a two year period having devoted 720-hours of unpaid overtime to BC.

101. In February through May of 2008 I again asked for an accommodation when BC made my part-time assistant full time status.

102. The assistant was already working 40 hours and therefore wanted the benefits that came with being a full time employee.

103. His full time status did not provide me with any additional assistance because he frequently worked 40 hours.

104. The Controller came into my office and verbally reprimanded me for gaining approval from the President for the Assistant to obtain full-time benefits.

105. It was at this time when I revealed to the Controller that I had been seeing a Psychiatrist (over the past year) for work-related stress.

106. It was at this time when I asked the Controller for an official accommodation and told him that my doctor was willing to write a letter that could be submitted.

107. Much time had passed and nothing changed. No accommodation was provided.

108. It's important to understand that unlike my Predecessor and Successor, I was handling BC during a time of ongoing crisis trying to get BC through until the new systems were implemented.

109. Nearly two years after my start date at BC, the new systems were to be implemented.

110. On Friday, June 20, 2008 the first system (of three) was being implemented.

111. On Friday, June 20, 2008 BC along with me and the DJJ Technologies consultant shut down the existing corporate phone system and implemented a new Avaya phone system.

112. I worked until 7:00 PM that evening.

113. On Saturday, June 21, 2008 BC along with me, my assistant, and a team of two consultants (from NSA) installed two new IBM servers (Windows 2003 Server and UNIX platforms).

114. On Saturday, June 21, 2008 when I arrived everyone started the morning enjoying coffee and donuts that the Controller had provided.

115. On Saturday, June 21, 2008 I not only worked with the NSA consultants to install the two IBM servers but also worked with the DJJ Technology consultant who installed the new Avaya phone system the prior evening.

116. On Saturday, June 21, 2008 the DJJ Technology consultant informed the Controller and I that the manufacturer (Avaya) did not reveal to them that a "software bug" existed in the phone system software.

117. On Saturday, June 21, 2008 the Controller and I expressed to the DJJ Technologies consultant that we would have never implemented knowing such a "software bug" existed.

118. The DJJ Technologies consultant convinced the Controller and I that the "software bug" would be monitored closely and that it wasn't necessary that we revert back to the old system.

119. On Sunday, June 22, 2008 there was not necessary to come into the office because the implementations of the three systems went extremely well.

120. On Monday, June 23, 2008 the entire office staff was operating on these three new server systems.

121. On Monday, June 23, 2008 the DJJ Technologies consultant was onsite the entire day and had consulted with the manufacturer (Avaya) and their engineers to discuss a permanent fix for the "software bug".

122. On Monday, June 23, 2008 the "software bug" was transparent to the employees because it was being monitored closely by the DJJ Technologies consultant and the Avaya engineers.

123. On Monday, June 23, 2008 by late afternoon a temporary fix was in place to enter a "special" code at the start of the next business day to work around the "software bug".

124. On Monday, June 23, 2008 the DJJ Technologies consultant was informed by the Avaya engineer that it would take a week or more to produce the permanent fix for the "software bug".

125. On Monday, June 23, 2008 the Controller and I was notified that BC had been the first Avaya customer to encounter this "software bug" because the phone system software version was newly rolled out for the first time and not properly tested by Avaya.

126. On Monday, June 23, 2008 a "temporary" fix was produced by the Avaya engineers and the DJJ Technologies consultant and Avaya lowered the severity level of BC's trouble ticket with their engineering department.

127. On Monday, June 23, 2008 the DJJ Technologies consultant, my Assistant, and I were trained on how to enter the "special" code to activate the "temporary" fix so that the problem would be transparent to BC's employee's on Tuesday morning.

128. On Tuesday, June 24, 2008 my assistant was scheduled to come into the office at 7:00am to enter the "special" code.

14

129. On Tuesday, June 24, 2008 my assistant called me at home at 7:15am (while I was showering) to notify me that "special" code would not work as it did the prior evening when the Avaya engineers turned it over to the DJJ Technologies consultant.

130. On Tuesday, June 24, 2008 from my home I had two simultaneous calls (from my landline and mobile phone) placed to talk with the DJJ Technologies consultant and my Assistant to rectify the matter.

131. On Tuesday, June 24, 2008 at approximately 8:10am while talking with the DJJ Technologies consultant (from my home), it was determined that the "special" code was not working and DJJ Technologies was unable to do anything to rectify that matter.

132. On Tuesday, June 24, 2008 I immediately left my home at 8:15am and drove to the office arriving at 8:44am according to my ADP payroll statement.

133. On Tuesday, June 24, 2008 I arrived at the office to resume troubleshooting the problem with the DJJ Technologies consultant (over the phone) and a barrage of employees came to my office holding me back from resolving the problem.

134. On Tuesday, June 24, 2008 the Controller was not in the office and I certainly could have used his assistance to handle the employees so that I could troubleshoot problem.

135. On Tuesday, June 24, 2008 since the DJJ Technologies consultant was unable to help me I devised a very common sense solution to work around the problem.

136. On Tuesday, June 24, 2008 I simply explained to the switchboard operator that the malfunction was happening when she would transfer the call to extension 500 (a.k.a., the queue) where the software would route the call to one of 10 (ten) Customer Service Representatives.

137. On Tuesday, June 24, 2008 I simply asked the switchboard operator to transfer the incoming calls to the individual Customer Service Representatives. This was a temporary way to get around the problem and it worked just fine because she was able to see on her switchboard panel which Customer Service Representative's lines were open.

138. Rather than the Customer Service Manager getting up out her chair to help me, she decided to call the President and tell him about this "software bug" that the Controller apparently kept a secret from him.

139. According to the Workers' Compensation deposition transcripts, both the Controller and President reported that only 15-20 minutes of calls were lost.

140. On Tuesday, June 24, 2008 the DJJ Technologies consultant was able to resolve the problem with the "special" code not working. This special code was also known as the "temporary fix".

141. I worked with the DJJ Technologies consultant the remainder of the morning to encourage the Avaya engineers to provide the permanent fix to the "software bug" as soon as possible.

142. The President and Controller had decided that I was "unable to handle the job" and to terminate me when in fact they should have praised me for handling the situation that Avaya (the manufacturer) and DJJ Technologies were responsible for.

143. I believe that I handled the situation just fine under the circumstances with having no help whatsoever.

144. Since the President and Controller felt that I wasn't able to handle the job, I want to explain this situation as the "perfect example" to prove to the Court that in order to

16

provide anything better than what I had done, then an accommodation should have been provided.

145. Since the Controller refused to provide me with an accommodation (even a temporarily one), then he should have been available on Tuesday June 24, 2008 to assist me during this crisis that only impacted the phone calls for approximately 15-minutes..

146. According to an e-mail from Donna Dolan, President of DJJ Technologies, "Only the manufacturer's engineers could resolve this problem".

147. At a Workers' Compensation hearing on October 6, 2009, both the President and Controller distorted the facts telling the Judge that I came into the office 15-minutes late.

148. Both the President and Controller were offsite that morning and if it wasn't for my efforts in providing a common sense work around for the dysfunction caused by DJJ Technologies and Avaya, the problem would had been much worse.

149. When BC came to the conclusion that I wasn't able to handle the job, this is where they made their biggest mistake because that was so far from the truth.

150. I'll prove them wrong in front of a Jury and I'll use the Workers' Compensation deposition transcripts to do so.

151. At a Workers' Compensation hearing on October 6, 2009, the President made a statement under oath "This problem was straw that broke the camel's back" in which he and the Controller decided I couldn't handle the job.

152. At a Workers' Compensation hearing on October 6, 2009, the President also indicated that there was a "much larger picture" in their decision to terminate me.

153. At a Workers' Compensation hearing on October 6, 2009, the President referred to "prior problems" that he claims the Controller has "documented".

17

154. I find it quite interesting to drill down into the details of this "much larger picture".

155. With no performance appraisal (last conducted on August 20, 2007) and no warnings, the "much larger picture" and "documented" evidence that the President is referring to is indeed my request to the Controller where I asked for an "official" accommodation.

156. I find it interesting that all three IT Managers at BC were deemed as being "not able to handle the job".

157. I believe that BC is unreasonable and that they discriminated against their IT Managers after using-and-abusing them.

158. For BC to use the phone system software bug as the "last straw" in their decision to terminate me is preposterous.

159. One to the items of interest in this case will be on the "much larger picture" that the President mentioned but didn't elaborate on at his Workers' Compensation deposition.

160. At a Workers' Compensation hearing on October 6, 2009, the Controller admitted under oath that there was no type of file or dossier whatsoever prepared for me.

161. BC had never provided me with any performance warnings whatsoever.

162. At a Workers' Compensation hearing on October 6, 2009, the Controller mentioned "if you walk to his desk 20, 30, 40 notes all over his desk".   That statement alone describes the chaotic work environment and work-related stress I endured at BC.

163. As previously noted, on a typical day at BC I had 2-3 employees at my door every 5-minutes along with incoming phone calls.

164. At a Workers' Compensation hearing on October 9, 2009 of the HR Manager she referred to me as a "good employee", "hard worker", and an employee who did "work long hours".

165. At a Workers' Compensation hearing on October 9, 2009 of the HR Manager indicated that "they had performance issues with him toward the end".

166. With that statement, is she opening up another aspect of discrimination admitting that there were performance issues at the end when I endured two herniated disc?

167. HR Manager stated under oath that I was a good employee, hard worker who worked long hours, and they had performance issues with me towards the end.

168. The HR Manager's scenario paints a picture of me being a dedicated employee who BC had "used & abused" and that "towards the end" I asked for an accommodation because I felt that my health was failing me due to the work-related stress and outrageous long hours I was working.

169. The President stated under oath that "it had been determined that he couldn't handle to job. So we hired an agency, placed some ads in the paper, and started the process".

170. During my two years of employment at BC the chaotic work environment caused me to neglect personal things that were important to me such as seeing a dentist, following up with my ENT doctor, caring for my home, and visiting family who resided out of town. I dedicated all of my energy to BC and they didn't appreciate it any of it and apparently felt that the 720-hours of unpaid overtime dedication I gave them wasn't enough.

171. The HR Manager denied any track record of insubordination.

172. On July 15, 2008 I endured two herniated discs as a result of a demanding call received by the President insisting upon a new printer/scanner/fax be installed immediately without delay.

19

173. On July 15, 2008 at that particular time, my assistant was on his hourly lunch break therefore leaving me to install (and lift) the heavy printer/scanner/fax without any help whatsoever.

174. The existing printer was working just fine and there was no reason that this new printer needed to be installed immediately.

175. While under duress (due to the President's unpleasant demeanor) I lifted the heavy printer/scanner/fax by myself and endured two herniated discs.

176. During my injury Leslie Goodman and Burton Scheff appeared to see what had happened as a result of a loud crashing sound and my crying out in pain.

177. Leslie Goodman witnessed Burton Scheff's (the CEO) disregard for my severe back and neck injury and was entirely consumed with whether the printer was damaged or not.

178. Nobody other than Leslie Goodman asked me if I was okay.

179. I stayed at work and due to extreme pain I had decided to go to the local emergency room.

180. From July 16th to July 30th 2008 I worked from home while laying on ice packs, taking Vicodin and a muscle relaxer.

181. During this timeframe I was being compensated by the company's Workers' Compensation insurance carrier.

182. I received a phone call at home from the Controller where he was being spiteful in trying to coerce me back to work when he asked "How can you afford to live off $550/wk compared to your regular weekly salary of $2,019/wk?"

183. At a Workers' Compensation hearing on October 9, 2009 of the HR Manager admitted under oath that she began searching for my successor in mid to late June 2008; however,

on July 30, 2008 she sent me an e-mail asking "I don't understand why you are able to work from home but can't come to work and work from here?".

184. Against my better judgment I went back to work against my doctor's recommendation believing that was the right thing to do.

185. This is another mistake that BC made that will be a topic interest for the Court.

186. At a Workers' Compensation hearing on October 9, 2009 of the HR Manager admitted under oath that she knowingly coerced me to come back into the office with full intentions of terminating me while I was otherwise supposed to be recuperating at home and tending to my doctor's appointments and physical therapy.

187. My first day back to BC after the injury was August 4, 2008 when I had to stop taking my Vicodin and muscle relaxer in order to drive to BC.

188. While working full-time but under "light duty" restrictions as prescribed by my doctor BC acted irresponsibly having me back on the job and further injuring myself.

189. While enduring unnecessary pain for two weeks and reinjuring myself, unbeknownst to me, BC had hired my predecessor on August 18, 2008 and had him in training to take over on August 25, 2008.

190. At Workers' Compensation hearings held in October 6th and 9th of 2009, the Controller, and HR Manager both admitted under oath that they hired my predecessor and that his first day of employment was on August 18, 2008 while I was working at BC against my doctor's recommendation.

191. On August 18, 2008 I sent the President an email at 6:10pm advising him that the company needed to become compliant and legal with its right to use Microsoft software

21

on its PC's that I upgraded over the past two years and I attached a quotation from Zones (the software vendor) in the amount of $18,032.84.

192. The Controller was well aware that it was necessary that he pay the $18,032 for upgrading the obsolete PC's.  Not paying for these upgrades for two years constitutes fraud.

193. It was "my job" as IT Manager to keep an inventory of the software serial numbers and legitimate use in the event of an outside audit.

194. The Controller conducted business in an unethical manner to save money and he told me that "his job" was to see that the Owner's received the most return for their investment. He also told me that his bonus was based upon his ability to curtail spending.

195. Because I reported to the Controller, he ignored my request for an accommodation because it would increase his spending and reduced his bonus.

196. He actually watched my job cripple me with stress and he did nothing to help me even when I presented to him with facts that I was being treated for work-related stress.

197. On or after August 18, 2008, and after receipt of my email regarding the $18,032 needing to be paid, the President paid a visit to my office.

198. It was quite unusual of the President to act so calm and peaceful.  He stood before me and praised me for doing such a good job on a sales report that I generated for him.  I found his attitude quite unusual; unlike his normal behavior.

199. As the President stood before me being very calmly and with direct eye contact, he continued to tell me a story about an incident where he had a dispute with a vendor and told them that he knew a lot of people across Long Island explaining that he could destroy their reputation.

22

200. In my opinion the President's tale about the vendor dispute was an analogy of what his plan was for me.

201. I interpreted this story as an indirect threat toward me. That he was going to destroy me.

202. I believe that BC used the preposterous phone system excuse as "the straw that broke the camel's back" to terminate me when in fact the President stated "there's a much larger picture".

203. The "larger picture" was my asking for an accommodation as I nearly destroyed myself being a viable asset to their business as its sales were increasing significantly.

204. At Workers' Compensation depositions, the Controller, the President, and the HR Manager all admitted under oath that they planned to replace me as far back as mid-June 2008 and that my successor was officially hired while I was onsite working at BC against my doctor's recommendation.

205. BC performed the same termination tactic when they replaced my predecessor Jaime Sanchez with me. I was also hired a week earlier and trained off-site as they planned to terminate Mr. Sanchez.

206. After BC coerced me to come back to work I was unable to take my prescription medications because I couldn't take them and drive and operate machinery.

207. On Thursday, August 21, 2008 my orthopedic doctor placed me off work again due to a relapse in my condition because BC didn't provide proper assistance to support my return to work under a "light duty" restriction as prescribed by the doctor.

208. On Friday, August 22, 2008 from at home I scanned the "Off Work" notice obtained from my orthopedic doctor and e-mailed it to the Controller, the President, and HR

Manager and explained that my condition had relapsed and that I would be off work for two weeks under my doctor's order.

209. BC at this time had already hired my successor and had two IT Managers (me and my predecessor) on the payroll both earning 6-figure incomes.

210. The HR Manager's goal was to only have one IT Manager on her payroll; therefore, she needed to find reason to fire me.

211. On Friday, August 22, 2008 the HR Manager (according to her deposition) indicated that she called me at home to inquire how I was doing and if I was in pain when in fact her goal was to eliminate one of the two IT Mangers off her payroll.

212. During the conversation with her I explained that my condition had relapsed and she replied, "hmmmmmmm you looked fine yesterday" and "why didn't you say anything to the Controller."

213. During the conversation I explained to the HR Manager that my doctor had officially placed me off work again and I asked that she reinstate my Workers' Compensation monetary benefits.

214. The HR Manager informed me that she could not do that because I had been fired.

215. On Monday, August 25, 2008, I received a certified letter via USPS from BC informing me that I had been fired for insubordination when in fact they admitted under oath that they had planned to terminate me back as early as mid-June 2008.

216. It is my belief that BC fabricated a scenario accusing me of insubordination so that they wouldn't have two IT Managers on the payroll being paid a 6-figure income.

217. It is my belief that BC retaliated against me because they were so astonished that my Doctor placed me off work the evening before they planned to fire me.

24

218. I believe that BC thought that they could treat a third IT Manager in this manner because the previous two were probably able to recover and move forward.

219. In my situation, BC has caused so much devastation to my life just in their retaliatory tactics against me alone that I am unable to move forward.

220. It was proven that my injuries sustained included two herniated discs and it was necessary that I was placed off work on August 21, 2008.

221. BC acted irresponsibly and illegally in terminating me when I was officially off work under order of my physician.

222. BC had no right whatsoever to terminate me when they on August 22, 2008, but they did so with disregard for me because of "money".

223. The Workers' Compensation deposition transcripts serve as factual resources in proving BC's acts of discrimination but most importantly their acts of retaliation against me.

224. On November 1, 2008 I sent a certified letter to BC in respect to my COBRA benefits and pleaded with them to allow me to pay the premium with my credit card because I had no monetary benefits from Workers' Compensation or from Unemployment.

225. The letter also asked that they provide me with the Short-term and Long-term disability insurance carrier information that I was entitled to as an executive level employee at BC. My previous requests for the insurance carrier information to the HR Manager were intentionally withheld from me and caused me unnecessary financial loss.

226. As result of working at BC and their retaliatory action toward me BC ignored my plea for help by not responding whatsoever to my certified letter sent on November 1, 2008 asking for help by providing the insurance carrier information.

227. In August 2008 Marcene Allen, the Credit Manager at BC had told me that I had was being treated differently as one of her employees who shattered his knee in a warehouse accident was being paid full salary during his absence from work.

228. As result of working at BC and their retaliatory action toward me BC denied me of having the necessary information to contact the Short-term and Long-term insurance carriers to inquire on my benefit eligibility and caused me unnecessary financial hardship.

229. As result of working at BC and their retaliatory action toward me BC interfered and intentionally caused a 2-year delay with my receiving Workers' Compensation monetary benefits that ultimately caused me to have no money for food, no medical insurance, no money to pay my mortgage, and no money to care for my 28 years old son who was born with spina bifida and is permanently in a wheelchair.

230. As result of working at BC and their retaliatory action toward me BC fabricated the claim of insubordination, reported that fabrication to the W/C insurance company's legal counsel and interfered with my receiving of monetary benefits for two years causing me financial hardship.

231. After two years of litigation in Workers' Compensation court in which the Controller, the President, and the HR Manager testified under oath, the Court unanimously ruled in my favor and I was awarded my monetary benefits.

232. It was too late though for me because I was well on my way into the foreclosure of my handicapped accessible home that I created for my son.

233. The pain and suffer that BC caused me up until that timeframe was unbelievably devastating for me.

26

234. BC is fully responsible for defamation of my character and maliciously retaliating against me causing a two year delay of my monetary benefits through the Workers' Compensation insurance carrier, and denying me the necessary information to obtain Short-term and Long-term disability benefits that I was eligible in receiving as an executive of the company.

235. As result of working at BC and their retaliatory action toward me I am dealing with inadequate care and malpractice of the Workers' Compensation insurance carrier in which BC maliciously passed along fabricated information causing the carrier to handle my claim with "bad faith".

236. At a Workers' Compensation hearing on October 6, 2009, The Controller distorted the facts on many occasions, evaded answers to questions, and lied under oath.

237. At a Workers' Compensation hearing on October 6, 2009, the Controller stumbled for his words when asked about our discussion regarding work-related stress.   It was quite obvious that their counsel, Lauretta Connors coached him to answer that question very carefully.

238. At a Workers' Compensation hearing on October 6, 2009, Lauretta Connors objected to any questions regarding the "company's sales significantly increasing" during my employment at BC.

239. At a Workers' Compensation hearing on October 6, 2009, Lauretta Connors objected to use of the word "stress" when the Controller was being questioned and admitted under oath that he had discussions with me regarding my work-related stress.

240. At a Workers' Compensation hearing on October 6, 2009, the Controller while under oath referred to my accommodation request as an "excuse".

241. At a Workers' Compensation hearing on October 6, 2009, the Controller lied under oath when he stated "We are not talking about a difficult job" in respect to my job as IT Manager. A job that required me to work 720-hours of unpaid over-time dedication – is in fact a difficult job!

242. On August 31, 2009, BC had my successor, Steven Blair write and affidavit where he states "it is my opinion that anyone who cannot manage stress effectively simply cannot serve in this type of position."

243. My successor came into my position after I spent two-years at BC working 720-hours of unpaid overtime preparing their business to operate efficiently with my expertise in upgrading three computer servers that was the nucleus of their business.

244. My successor probably has a nice 8-5 job thanks to all of the hard work and dedication that I applied over the two year of employment at BC upgrading their systems.

245. My successor in his affidavit mentions stress, but he has no clue what I endured in respect to stress and the Controller not spending, paying, and accommodating.

246. With the details presented within the complaint, the Court can understand why Steven Blair supposedly doesn't report to the Controller as I did.

247. At a Workers' Compensation hearing on October 6, 2009, the Controller lied under oath when he distorted the facts regarding that my predecessor had worked normal hours. The Controller failed to explain to the Court was that my Predecessor was terminated was because never worked beyond 5:00pm and never made himself available after hours to assist the President or for special projects.

248. All of my interviews with BC were scheduled after 5:00pm at BC knowing that my Predecessor had left the building at 5:00pm.

249. On my first day of employment at BC, the Controller explained to me that my Predecessor was terminated because they didn't feel that he could handle the job and that he did not make himself available after 5:00pm.

250. On my first day of employment at BC, the Controller further explained to me that leaving at 5:00pm did not go over well with the President; therefore, warning me what I should do to keep my job.

251. My Predecessor was terminated because the Controller needed someone to be dedicated to the job and implement the new computer systems to support the company growth.

252. At a Workers' Compensation hearing on October 6, 2009, the Controller acknowledged "the hours that Ron was putting in" but distorted the facts as to why I provided 720-hours of unpaid dedication.

253. In the Workers' Compensation deposition, the Controller also acknowledged that my Predecessor and Successor worked "normal business hours" and was trying to insinuate that there was something wrong with me because I was working such long hours. That ridiculous tactic obviously makes no sense whatsoever.

254. The Controller lied under oath by distorting these facts regarding the reason for my long work hours. I gave up a lot of my own personal time (and risked my health) and I'm appalled the Controller distorted the facts to the Court creating a perception that there was something wrong that I was working long hours unlike my predecessor and successor.

255. At a Workers' Compensation hearing on October 6, 2009, the Controller failed to explain to the Court that my 720-hours of unpaid overtime dedication was because I was one person performing the job of three employees all the while BC's sales had significantly increased.

256. At a Workers' Compensation hearing on October 6, 2009, The Controller and BC's legal counsel was very careful to not reveal that the company's sales had significantly increased which constituted my long work hours.

257. BC is fully responsible for the Workers' Compensation insurance carrier handling my case in "bad faith" and I am consulting with malpractice attorneys to sue Utica National Insurance Company.

258. I was told that Steven Blair, my Predecessor reports to the President and not the Controller.  If true, I want to establish a connection with the Controller not providing me with the necessary resources to perform my job and his conflict of interest by in regard to his resistance in spending/paying for goods and services that were necessary for me and my department.

259. It is my belief that there was a conflict of interest with the Controller in that he discriminated against me and defrauded Microsoft all in an attempt to secure his own bonus.

260. There are other acts of fraud that could be raised related to pressure the Controller placed upon DJJ Technologies to be more competitive in their pricing for the new Avaya phone system.  He used two estimates that I obtained from DJJ Technologies' competitors to achieve this and fraud was committed with the leasing company for DJJ Technologies to continue having the pleasure of doing business with BC.

261. My mentioning of this is to establish evidence to the Court that he was not going to spend any money that he wasn't forced to pay.  His business ethics and self-serving mission to secure his bonus got in the way of my accommodation and the smooth operation of my IT Department.

262. On August 28, 2009, Kim Keefe issued an affidavit that I find quite interesting as she claims that BC has always been extremely accommodating to her when she had required leaves for personal or family medical issues.

263. Ms. Keefe's statement proves that BC treated me differently by accommodating "her" and other employees and not me.

264. I was treated differently by having to work 720-hours of unpaid over-time which caused my health to deteriorate.  And you know what?  Those 720-hours of unpaid overtime apparently were not good enough for BC to get from me.

265. How could BC accommodate me as far as time off when I was giving them more than they could ever give back in return?  I couldn't have a normal lunch or dinner, or even utilize my dental insurance, or follow through with my visit to the Ear, Nose, & Throat doctor because of demands BC placed upon me.

266. I dedicated my life to BC and performing my job the best way I could regardless of their lack of providing me an accommodation.

267. BC in a retaliatory manner one year after my wrongful termination, BC used another malicious tactic against me whereas they alleged that a computer hard drive was cleared and that they were unable to restore it.

268. One year after my wrongful termination, BC in a retaliatory demeanor used the alleged hard drive matter in a malicious attempt to destroy my eligibility for Unemployment.

269. One year after my wrongful termination, was the first time I had heard anything regarding the alleged problem they encountered restoring a hard drive.

270. It was my genuine understanding that the hard drive was restored by the assistant and successfully accomplished; otherwise, BC could have contacted me and as a professional I would have assisted them.

271. The DOL Court unanimously ruled in my favor because BC didn't appear at the hearing I believe on two occasions.

272. As result of working at BC and their retaliatory action toward me, I have become insolvent.

273. I lost my home to a short sale after desperately trying to save it by cashing n insurance policies and 401(k) plans.

274. As result of working at BC and their retaliatory action toward me, I was not able to care for my severely disabled son because BC destroyed my eligibility for benefits (e.g., Unemployment, Workers' Compensation) causing them to be delayed for two years.

275. Not only did I suffer from BC retaliatory actions, but so did an innocent young man (my son) whose condition is life threatening and he depended on his Dad caring and supporting him.

276. As result of working at BC and their retaliatory action toward me, I lost my home that was especially chosen and adapted to accommodate my disabled son who is in a wheelchair.

277. As result of working at BC and their retaliatory action toward me, I have become unemployable in the IT field where I was flourishing at the height of my career.

278. I've been told by employment agencies that my career is ruined because I haven't worked in four years.

279. As result of working at BC and their retaliatory action toward me, I most likely will never be able to work at the same earning capacity I had throughout my career in IT.

280. As result of working at BC and their retaliatory action toward me, I'm now on Social Security Disability and so distraught over my losses that I'm unable to function as I had when I was employed at BC during which I gave them an extraordinary work ethic including 720-hours of unpaid dedication.

281. While employed at BC my stress level rose to an unprecedented level of "7" because I realized that this business was rapidly growing and the Controller was ignoring my requests for additional help during a period when it would have been justified with the business sales increasing so rapidly.

282. My health has significantly declined because BC would not accommodate me even temporarily during the two year transition to implement three new major systems I was hired to implement as a result of their sales significantly increasing.

283. While employed at BC, by spring 2008 my stress level was peaking near "10" and then on July 15, 2008 the President displayed a huge fit of anger and I lifted a large printer/scanner/fax (without the help of an assistant) and endured two herniated discs.

284. My herniated discs are directly related to the President's outrageous behavior in insisting that the printer be installed immediately without delay.

285. Upon my termination from BC, my Psychologist explained my condition as "unable to handle multiple stimuli".

286. I would describe my condition as Post-Traumatic Stress Disorder ("PTSD") which I struggle with daily since my departure from BC.

287. I link my psychiatric condition to the intolerable work conditions at BC where I endured continuous interruptions and their denial of my requested accommodation.

288. BC has engaged in retaliation tactics against me and has fought me when all I wanted was to please them and show them that I was the best employee they ever had.

289. The hours of dedication I put into my job are proof that I wanted to please them and be treated with respect.

290. After years of enduring BC contesting my Unemployment and Workers' Compensation benefits, my health has continued to decline and I've begun having feelings of hopelessness.

291. In December 2010, a Social Security Disability Judge granted my disability mostly on the basis of consequential depression which I fully hold BC responsible for their discriminatory and retaliatory actions toward me.

292. The SSD Judge and my attorney were also aware of the permanent damage to my cervical and lumbar spine and the excruciating pain that comes with such an injury.

293. The President and the Controller both are responsible for my inability to work because they ignored my request for an accommodation and never provided one when it was quite evident (by the entire staff at BC) that one was needed.

294. While working 720-hours of unpaid overtime, it was obvious that I needed an accommodation when I would literally tell people that I couldn't help them but my assistant was available.

295. As result of working at BC and their retaliatory action toward me, I feel depressed, and helpless in overcoming the damage that they have caused. Although I'm being treated by physicians, I feel as though I'm losing precious time that could have otherwise been used

to build my financial wealth, supporting my disabled son who needs his Dad, being available for ailing parents, etc. Instead, I wake everyday scrambling to overcome the damages I endured from the discrimination and retaliation that BC had done to me.

296. I believe that BC has been instrumental in collaborating with Utica National Insurance Company, their Workers' Compensation insurance carrier whereas they have treated my case with disregard and "bad faith".

297. As a result of this "bad faith" I am not receiving the necessary treatments I need to get well.

298. As a result of this "bad faith" I've been subjected to malicious tactics from Utica National Insurance Company so severe that I had wrote a letter to Governor Cuomo who assigned a personal advocate to help me.

299. In November 2011, I received a notice from the Department of Human Rights ("DHR") that a "fact finding" conference had been scheduled.

300. Coincidently on the same day as the fact finding conference I had a Workers' Compensation hearing.

301. I ask the DHR if my fact finding conference could be rescheduled and I was told that it would be.

302. When I appeared at my Workers' Compensation hearing the insurance company and BC did not appear and my W/C attorney told me that BC's legal team most likely masterminded the conflicting appointments in an attempt to squash my complaint against them.

303. While waiting for the "fact finding" conference to be rescheduled, there were several attempts to settle this matter with BC through opposing counsel.

35

304. Their settlement amount was not acceptable but after being beaten down so badly for 4-years my stress level was at "10" and I "considered" settling because of what this stress was doing to my health.

305. When my attorney would ask opposing counsel for the agreement to be worded in such a way to not only protect BC but protect me as well, they dragged their feet with really no intention to settle with me at all.

306. Six months had passed and BC's legal counsel continued to not word the settlement agreements in such a way to protect me.

307. I believe that BC's legal counsel was playing on my fear that "they" concocted to shut me down.

308. In April 2012, the DHR called me and said that they were close to making a decision on my case and that I should consider settling with BC if I have the opportunity to do so.

309. I complained to the DHR representative that I was being treated unfairly because my "fact finding" conference had never been rescheduled but his hands were tied and his manager was more interested in "Rubber Stamping" my case as closed.

310. My attorney was on a holiday that Friday and he contacted me indicating that he would confer with opposing counsel on Monday.

311. The settlement was still on the table as of that Monday, but when the DHR suddenly dismissed my complaint on Tuesday (while correspondences were sent between parties), BC's legal counsel stopped corresponding and the settlement apparently was off the table.

312. It was my observation that BC's legal counsel was trying to instill fear in me by not writing the settlement in a way that would protect my rights. They thought they were

playing the fear card against and that I was so desperate to settle for their unacceptable amount of $7,500 and they were wrong.

313. By them not following up after the DHR dismissed the complaint, I saw that as yet another act of retaliation toward me and the "final straw" in my decision to exercise my "right to sue". I didn't lose $7,500... but BC lost an opportunity to settle because their legal counsel never followed through.

314. I am pursuing my "right to sue" because I believe that BC <u>intentionally</u> harmed me because I simply asked them for an accommodation.

315. Synonyms of the word "intentionally" are: deliberately, calculatedly, with intent.

316. It was within the Workers' Compensation deposition transcripts where I discovered their <u>intent</u> to harm me because I asked for an accommodation for my health.

317. The Workers' Compensation depositions and the hardcopy evidence I will provide clearly brings to light the exact reason that I had asked for the accommodation to begin with. Their admission under oath and the sequence of event are proof of their deliberate acts of discrimination and retaliation.

318. It was within the Workers' Compensation deposition transcripts where I discovered their many <u>deliberate</u> acts of retaliation toward me.

319. It was my observation of the reactions of both the Department of Labor and Workers' Compensation Judges when they learned of what BC had done to me, that I realized how <u>calculated</u> and illegal their actions were towards me.

320. Since my termination to present time, my nervous system has endured such trauma that I am:

       1.) Unable to concentrate and focus on tasks

2.) Unable to sleep peacefully due to the herniated discs

3.) Unable to recover as I relive (every 10-minutes) the traumatic situation endured when BC retaliated against me.   I see a psychologist in attempt to overcome these obsessive compulsive thoughts.   I relive it over-and-over until I mentally exhaust myself to the point I have to sleep

4.) I have severe symptoms of Post-Traumatic Stress Disorder ("PTSD") when interacting with people (and multiple stimuli) which is directly linked to the chaotic two years at BC when they refused to accommodate me

5.) Unable to have normal bowel movement whereas laxatives don't respond

6.) Unable to care for myself (forgetting to eat, take medicine, bathe, etc)

7.) Unable to have a relationship and sex

8.) Unable to breath normally due to frequent panic attacks

9.) Unable to stand or sit for long lengths of time without enduring extreme discomfort

10.) Unable to be around any confusion whatsoever

11.) Unable to multitask or be around situations where there are multiple stimuli

12.) Unable to enjoy my life as I'm struggling each day to just get by

13.) Unable to be available to my family or friends, and most importantly my disabled son who is permanently in a wheelchair.   My mission in life was to have a home to accommodate his wheelchair, provide for him, and be there as his advocate

14.) Feeling impending doom as I struggle daily with my disability that BC caused and the inadequate care from the Workers' Compensation insurance carrier

38

who has treated my case in "bad faith".  The Workers' Compensation insurance
carrier would rather I die than see that I recover

15.) Feeling depressed and hopeless of a positive future

16.) Feeling homeless and that there will be nobody to care for me

17.) Feeling scared and the need to be near family who are out-of-town

18.) Feeling that I'm going to die

19.) Disabled now, on Social Security Disability, and unable to work in the
capacity I once was when I was functioning (and had worked 720-hours of unpaid
overtime) at the height of my career while working at BC

20.) Unable get well because BC, their counsel, and their Worker' Compensation
insurance carrier have attacked me knowing that I am disable as a result of BC's
outrageous behavior toward me

22.) Additionally ill from the pain and suffering endured as I've felt forced to
continue this ongoing legal dispute with BC to see that justice is served and that I
have some sort of recovery

## COUNT I
## (ADA)

321. I repeat and reallege every allegation in paragraphs 1 – 320 of this Complaint with the
same force and effect as if fully set forth herein.

322. BC employs over 100 employees.

323. At all relevant times BC was an "employer" within the meaning of the ADA 42 U.S.C. §
12101 et seq.

324. At all relevant times I was an "employee" within the meaning of the ADA 42 U.S.C. §
12101 et seq.

325. BC's conduct, as alleged herein, constituted unlawful employment practices and unlawful discrimination in violation of ADA 42 U.S.C. § 12101 et seq.

326. BC's conduct, as alleged herein, was carried out with malice or reckless disregard for my protected rights to be free from discrimination.

327. As a result of BC's unlawful conduct, I suffered and continue to suffer injury, with resulting monetary and other damages, including without limitation lost wages, lost back pay, lost front pay, lost benefits, lost pension and retirement benefits, lost attorney's fees.

328. I am entitled to recover such monetary and other damages, punitive damages, interest, and attorney's fees' and costs from BC under the ADA.

329. As a further result of BC's unlawful conduct, I suffered and continue to suffer, among other items, impairment and damage to my good name and reputation, emotional distress, emotional pain, suffering, loss of enjoyment of life, embarrassment, and humiliation.  I am entitled to recover damages for such injuring from BC under the ADA.

## COUNT II
## (NYSDHR)

330. I repeat and reallege every allegation in paragraphs 1 – 329 of this Complaint with the same force and effect as if fully set forth herein.

331. At all relevant times BC was an "employer" within the meaning of the NYSHRL NY Exec. Law § 290 et seq.

332. At all relevant times I was an "employee" and a "person" within the meaning of the NYSHRL NY Exec. Law § 290 et seq.

333. BC's conduct, as alleged herein, constituted unlawful discrimination practice and unlawful discrimination on the basis of my disability in violation of the NYSHRL.

334. As a result of BC's unlawful conduct, I suffered and continue to suffer injury, with resulting monetary and other damages, including without limitation lost wages, lost back pay and front pay, lost benefits, lost pension and retirement, attorney's fees and costs.

335. I am entitled to recover such monetary and other damages under the NYSHRL.

336. As a further result of BC's unlawful conduct, I suffered and continue to suffer, among other items, impairment and damage to my good name and reputation, emotional distress, emotional pain, suffering, loss of enjoyment of life, embarrassment, and humiliation. I am entitled to recover damages for such injuring from BC under the NYSHRL.

## COUNT III
## (RETALIATION UNDER THE ADA)

337. I repeat and reallege every allegation in paragraphs 1 – 336 of this Complaint with the same force and effect as if fully set forth herein.

338. I suffered retaliation on the basis of asking for an accommodation for my disability.

339. I suffered retaliation on the basis of asking for and taking workers compensation leave.

340. BC's conduct is a violation of the ADA.

341. I was discriminated against by BC with respect to suitable accommodations at the workplace, employee compensation and other terms, conditions and privileges and reemployment because of my disability.

342. That as a result of the foregoing I suffered severe emotional distress, mental anguish, humiliation, depression.

343. I am entitled to damages, costs, expenses and attorney's fees pursuant to 42 U.S.C. § 12122.

41

## COUNT IV
## (RETALIATION UNDER THE NYSDHR)

344. I repeat and realleges every allegation in paragraphs 1 – 343 of this Complaint with the same force and effect as if fully set forth herein.

345. That as a result of BC's willful acts, I have lost a valuable employment position, valuable employment opportunities, back pay, front pay, benefits, retirement benefits, and have suffered mental anguish all in violation of the NYSDHR.


## COUNT V
## (DISPARATE TREATMENT UNDER THE ADA)

346. I repeat and reallege every allegation in paragraphs 1 – 345 of this Complaint with the same force and effect as if fully set forth herein.

347. BC's conduct, as alleged herein, constituted unlawful employment practices and unlawful discrimination in violation of ADA 42 U.S.C. § 12101 et seq.

348. I was treated in a disparate manner from my peers at the managerial level at BC.

349. While other managers requested aid in their departments and had their request fulfilled, my department was not deemed fit for reasonable help.

350. As a result of this conduct I suffered severe work stress that exasperated my already diagnosed disability.

351. I am entitled to damages, costs, expenses and attorney's fees pursuant to 42 U.S.C. § 12122.


## COUNT VI
## (DISPARATE TREATMENT UNDER THE NYSDHR)

352. I repeat and realleges every allegation in paragraphs 1 – 351 of this Complaint with the same force and effect as if fully set forth herein.

353. That as a result of BC's willful acts, I have lost a valuable employment position, valuable employment opportunities, back pay, front pay, benefits, retirement benefits, and have suffered mental anguish all in violation of the NYSDHR.

**WHEREFORE**, I Ronald Thomas, Jr. demands judgment against the Defendants as follows:

A. On my First Claim, compensatory and punitive damages to the maximum extent allowable by law, attorney's fees, interest and cost.

B. On my Second Claim, compensatory damages to maximum extent allowable by law, interest and costs.

C. On my Third Claim, compensatory and punitive damages to the maximum extent allowable by law.

D. On my Fourth Claim, compensatory damages to the maximum extent allowable by law.

E. On my Fifth Claim, compensatory and punitive damages to the maximum extent allowable by law.

F. On my Sixth Claim, compensatory damages to the maximum extent allowable by law.

G. Such other and further relief as the Court deems appropriate under the circumstances.

Dated: December 24, 2012 (original)         Amended: March 12, 2013

Ronald Thomas, Jr. *pro se*
P.O. Box 1323
Westhampton Beach, N.Y.  11978

43

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 12 2013 ★

LONG ISLAND OFFICE

Plaintiff(s),

-against-

**AFFIRMATION OF SERVICE**

_12_-cv-_6363_(JFB)(ARL)

Defendant(s).

-------------------------------------------------------X

I _Ronald C Thomas Jr_ declare under penalty of perjury that I have

served a copy of the attached _Ammended Complaint_

upon _Angel R. Sevilla & Ellen Storch_

by mailing it to _Kaufman Dolowich Voluck & Gonzo, LLP_

whose address is: _135 Crossways Park Drive_
_Suite 201_
_Woodbury, NY 11797_

Dated: _____, 20___
Central Islip, New York

_Ronald C Thomas Jr._
Signature

_PO BOX 1323_
Address

_Westhampton Beach, NY_
City, State & Zip Code
_11978_